FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2007 JAN 31  PM 4: 47

CLERK_____
SO. DIST. OF GA.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

RUBY N. LEBEAU,                      )
                                     )
     Plaintiff,                    )
                                     )
v.                                   )      Case No.  CV405-180
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of Social Security,     )
                                     )
     Defendant.                    )

## REPORT AND RECOMMENDATION

Plaintiff has brought this action challenging the Social Security Commissioner's denial of her application for disability insurance benefits. For the reasons that follow, the Court recommends that the Commissioner's decision denying benefits be AFFIRMED.

## I.  BACKGROUND

### A.  Procedural History

Plaintiff filed for disability insurance benefits on April 21, 2003.  Tr. at 55-57.  Plaintiff alleges that she became disabled on December 20, 2001,

due to severe post-surgical adhesions, urinary incontinence, low back and leg pain, and severe depression. Tr. at 36. Her claim was denied initially and on reconsideration. Tr. at 30-33, 35-38. Plaintiff requested an administrative hearing, which was held on August 13, 2004 before Administrative Law Judge ("ALJ") G. William Davenport. Tr. at 435. The ALJ issued a decision denying plaintiff's application for benefits on January 24, 2005. Tr. at. 12-25. On July 29, 2005, the Appeals Council denied plaintiff's request for review of that decision, thereby adopting the decision of the ALJ. Tr. at 5-7. Plaintiff then filed the present action for review of the Commissioner's decision, pursuant to 42 U.S.C. § 405(g). Doc. 1. Plaintiff has therefore exhausted her administrative remedies, and review under 42 U.S.C. § 405(g) is now appropriate.

## B.   Factual and Medical Background

Plaintiff was 37 years old when she allegedly became disabled and is currently 42 years old. Tr. at 55. She has a high school degree, attended college for one year, and completed a vocational training program at Savannah Vo-Tech. Tr. at 78. She has worked as a firefighter, emergency

medical technician, emergency room technician, bounty hunter, bodybuilder, secretary for a construction company, scale operator, assistant manager at a convenience store, assistant manager at a video store, clerk cashier, hotel maid, safety engineer and deckhand on a barge, dump truck driver, seafood market laborer, trailer-rental clerk, and inventory manager. Tr. at 439-450. As of the date of the ALJ's decision, plaintiff had not worked in any substantial gainful activity since December 20, 2001. Tr. at 55.

## Medical Evidence Presented to the ALJ

The record reflects plaintiff's history of multiple abdominal and pelvic surgeries with a total hysterectomy with bowel enterotomy and repair in 1991. Tr. at 193. Plaintiff was diagnosed with irritable bowel syndrome in February 2002. Tr. at 192. On March 19, 2002, Dr. Joseph Stubbs III and Dr. Daniel Bigggerstaff performed multiple surgical procedures on plaintiff, including a laproscopic enterolysis[1] and ureterolysis,[2] right oopherectomy,[3]

---

[1] A "[d]ivision of intestinal adhesions." Stedman's Medical Dictionary 577 (26th ed. 1995).

[2] The "[s]urgical freeing of the ureter from surrounding disease or adhesions." Id. at 1890.

[3] The "[e]xcision of one or both ovaries." Id. at 1273.

3

and a laproscopic retropubic urethropexy/Burch procedure[4] and cytoscopy. Tr. at 325-29.  Dr. Maura E. Kaczkowski also performed a laproscopic cholecystectomy[5] and a repair of a hole in the left labia minora on March 19, 2002.  Tr. at 323.

In April 2002, plaintiff expressed displeasure with the results of her labial surgery, and Dr. Harry S. Collins discussed laser labioplasty for reduction of the labial hypertrophy.  Tr. at 278.  On July 3, 2002, Dr. Collins performed laser bilateral reduction labioplasty, and plaintiff's progress notes indicate that she was happy with the results of the surgery. Tr. at 177, 272.

On September 23, 2002, plaintiff saw Dr. Collins complaining of pelvic pain with known pelvic adhesion disease and an episode of urinary incontinence after coughing.  Tr. at 161.  Dr. Collins recommended the break up of the scar tissue and the removal of plaintiff's left fallopian tube and ovary.  Tr. at 158.  Dr. Collins performed an exploratory laparotomy, left salpingo-oophorectomy, and lysis of adhesions on September 25, 2002. Tr. at 159.  Findings at the time of the surgery indicated severe pelvic

---

[4] The "[f]ixation of urethra and bladder for stress incontinence." Id. at 1891.

[5] The "[s]urgical removal of the gallbladder. Id. at 327.

adhesion disease.  Id.   Dr. Collins prescribed Percocet and estrogen replacement therapy following these procedures.  Tr. at 160.  On October 29, 2002, plaintiff's follow-up examinations were normal and her incision was well-healed.  Tr. at 269.  Plaintiff indicated to Dr. Collins that she felt great and had begun an exercise program.  Id.  During subsequent visits to Dr. Collins in January and March 2003, plaintiff reported feeling better on the estrogen replacement therapy but complained of urinary incontinence, for which she had seen Dr. Mark Byron.  Tr. at 267.  Dr. Collins prescribed Lorcet Plus for pelvic pain because plaintiff was taking a long bus trip to visit her son in Wyoming.  Id.

On September 9, 2003, Dr. David L. Cheng and Dr. Stephen Michigan performed a placement of a pubovaginal sling, a cytoscopy, and an insertion of supra-pubic tube for plaintiff's urinary stress incontinence.  Tr. at 315-316.

On April 12, 2004, plaintiff saw Dr. Edward G. Allcock for severe low back and leg pain and reported a history of chronic low back pain.  Tr. at 387-90.  During an examination, Dr. Allcock noted that plaintiff's neck was without tenderness to palpation but there was restriction to the range of

motion of plaintiff's cervical spine.  Tr. at 389.  Dr. Allcock found no scoliosis in a skeletal examination and range of motion was normal in the thoracic, cervical, and lumbar spine with pain and tenderness in the lumbar spine soft tissues.  Id.  Plaintiff's strength was symmetric in the upper and lower extremities and her gait was normal with no deficits at the hips, knees, or ankles.  Id.  Dr. Allcock prescribed Vicodin and Neurontin.  Tr. at 385.  In a follow-up appointment June 22, 2004, plaintiff reported that her pain was improving and that the Neurotin reduced her spasms and leg pain.  Tr. at 384.  Plaintiff reported to Dr. Allcock that she was still unable to secure employment, however, due to her uncontrollable bladder and occasional bowel incontinence.  Id.

During a physical therapy visit to Dr. Colleen Johnson on July 9, 2004, plaintiff complained of low back and leg pain and that this pain was preventing her from working.  Tr. at 381.  Plaintiff had good range of motion and only slight pain when she extended her leg.  Id.  Dr. Johnson's assessment concluded that plaintiff's abdominal surgeries may have led to significant abdominal and low back weakness and perhaps contributed to her current symptoms.  Tr. at 382.  Plaintiff also reported to Dr. Johnson

6

that she felt adverse effects from taking the Neurotin and that her health had improved after she discontinued taking it. Id.

During an initial psychiatric evaluation by Dr. Frank M. Johnston on May 22, 2002, plaintiff complained of several infirmities, including of severe low back and leg pain, vaginal burning, vaginal pain during intercourse, depression, irritability, anorexia, and thoughts of suicide. Tr. at 225-226. Dr. Johnston diagnosed plaintiff with reactive depression and prescribed Wellbutrin for depression and Librium for anxiety. Id. During a June 19, 2002 visit, Dr. Johnston noted that plaintiff's depression was improving and that plaintiff indicated she was "better." Tr. at 224. During a July 31, 2002 visit, plaintiff indicated that she underwent laser labial reconstruction surgery but was still experiencing isolation, insomnia, and anorexia. Tr. at 223. Dr. Johnston referred plaintiff to Dr. Adele Burnsed-Geffen for psychotherapy, and after three visits with Dr. Burnsed-Geffen she returned to Dr. Johnston expressing an "ok" mood during a visit on September 11, 2002. Tr. at 222. Following a mental status examination, Dr. Johnston noted that plaintiff's depression was improving. Id. During an October 23, 2002 visit with Dr. Johnston, plaintiff denied having any symptoms of

depression and was alert and oriented. Tr. at 221. Dr. Burnsed-Geffen's notes from November 11, 2002 reflect that plaintiff was feeling better and that her emotions were more normal. Tr. at 201.   Dr. Burnsed-Geffen's notes from December 18, 2002 indicate that plaintiff was medically released to return to work but was unable to find employment. Tr. at 200. Plaintiff also reported that her sexual functions were "ok." Id. In February 2003, plaintiff reported to Dr. Johnston that she was doing "pretty good" and denied symptoms of depression.   Tr. at 218.   A mental status report indicated that plaintiff was alert and oriented. Id. On March 19, 2003, during her last documented visit to Dr. Johnston, plaintiff reported that she had been out of her Wellbutrin prescription for three days and had subsequently become "angry." Tr. at 217. Once again, plaintiff's mental status was alert and oriented, and she denied any symptoms of depression. Id.

During a psychological evaluation for the Social Security Adminstration by Daniel B. Nagelberg, Ph.D., on July 17, 2003, plaintiff complained of depression, bladder and bowel problems, and abdominal adhesions. Tr. at 288. Dr. Nagleberg reported that plaintiff was friendly,

pleasant, polite, and cooperative and her thinking was logical, coherent, and goal-directed.  Id.  Plaintiff's affect was flat and her mood appeared depressed. Id. Plaintiff reported feelings of depression, difficulty sleeping, poor appetite, low energy, and a low sex drive. Tr. at 289.  Plaintiff claimed to have attempted suicide by overdosing on medication on three previous occasions;[6] however, she denied any current feelings of suicide.  Id.  With regard to her daily activities and ability to function, plaintiff reported that she sometimes required assistance from her husband to bathe, dress, and groom.  Tr. at 290.  She indicated that she occasionally did some laundry and drove when needed.  Id.  Plaintiff reported that she enjoyed playing on the computer and was able to manage her bills and finances.  Id.  Dr. Nagelberg's diagnostic impression was mood disorder due to  medical problems.  Id.  Dr. Nagelberg determined that while plaintiff was able to understand and carry out simple instructions, her ability to focus was likely compromised and her irritability and depression may hinder her ability to get along with co-workers.  Tr. at 291.  Dr. Nagelberg also noted that

---

[6] The ALJ noted in his decision that plaintiff's allegations of suicide attempts were not supported by any medical records besides a notation from Dr. Allcock of a well-healed scar on plaintiff's left wrist. Tr. at 21.

plaintiff's prognosis was guarded and heavily dependent upon her medical and physical status.  Id.

During a disability evaluation on September 15, 2004 by Dr. Steven Novack, an orthopedist and rehabilitation specialist, plaintiff complained of low back pain and leg pain that had worsened since a motor vehicle accident on August 13, 2004, which also caused pain in plaintiff's right shoulder. Tr. at 399-400. In his medical assessment, Dr. Novack noted that plaintiff was not impaired in her ability to sit, stand, or walk.  Tr. at 405-406.  According to Dr. Novack, plaintiff could lift no more than 20 pounds occasionally or 10 pounds frequently and could climb, balance, stoop, crouch, kneel, and crawl occasionally.  Id.

On September 21, 2004, Dr. Ismael Hernandez, a specialist in family practice and urgent care, conducted a disability evaluation. Tr. at 408-414. During that evaluation, plaintiff complained of severe adhesions, low back pain, depression, fatigue, ovarian cyst, and mental problems, but made no mention of a motor vehicle accident.  Tr. at 408.  In a mental status examination by Dr. Hernandez, plaintiff was alert, fully oriented, and did not appear to be in acute distress. Tr. at 409. Dr. Hernandez assessed that

in an eight-hour workday, plaintiff was capable of sitting, standing, and walking without restriction. Tr. at 411-412. According to his assessment, plaintiff could lift no more than 20 pounds occasionally and 10 pounds frequently, she could never climb a ladder, rope, scaffolds, ramp, or stairs, but she could balance occasionally and was able to crouch, kneel, and crawl frequently. Id. Dr. Hernandez concluded that plaintiff's return to work would, in his opinion, help her forget some of her pain problems. Tr. at 410.

### Testimony Before the ALJ

On August 13, 2004, the ALJ held a hearing and heard testimony from plaintiff; plaintiff's husband, Charles Lebeau; and plaintiff's acquaintance, David MacPherson. Tr. at 435-473.

Plaintiff testified that it had been since December 2001 when she last worked to earn money. Tr. at 440. When questioned about her current physical capabilities, plaintiff stated that she did very little driving and that her husband did most of the housework. Tr. at 452-53. Plaintiff testified that she rarely went grocery shopping because of her pain. Id. Plaintiff reported that she belonged to a dart team but stated that she normally just

11

kept score because it was hard for her to sit in one position for an extended period of time. Tr. at 454. Plaintiff claimed that she was no longer socially active and no longer read because her vision had deteriorated and her concentration level was low. Tr. at 455. She claimed that she had not seen a movie in three years and had eaten out at a restaurant only twice in the past three years. Tr. at 456. Plaintiff testified that her abdominal pain, caused by the numerous surgeries, prohibited her from exercising. Id.

Plaintiff testified that most serious work impairment was the severe pain in her low back and the deteriorating bones and nerves in her hip and back. Tr. at 456. She testified that a doctor told her that she would have to use a wheelchair in the near future. Tr. at 457. Plaintiff also complained of a urinary incontinence problem. Id. She testified that because of her inability to work she was depressed and had attempted suicide. Id.

On examination by her attorney, plaintiff testified as to the side effects of the medication she was taking, including Wellbutrin, Librium, Zanaflex, and Vicodin. Tr. at 461-62. She testified that she could no longer perform many of her prior jobs because she had lost her strength. Tr. at 463. She also testified that she could not handle a sedentary job because

she could not deal with people due to her urinary incontinence problem and short temper.  Tr. at 464.

Charles Lebeau, plaintiff's husband, testified that plaintiff exhibited pain in her back and legs.  Tr. at 465.  He testified that he did most of the household work including the laundry and cooking, and when plaintiff did not feel like cooking they would "usually go out and get something to eat." Id.  He claimed that the heaviest object plaintiff had lifted in the past couple of years was her purse.  Tr. at 467.

David MacPherson, plaintiff's acquaintance, testified that they had been friends for the past seven years and that since December 2001, plaintiff could no longer lift weights, teach wrestling, swim, or dance.  Tr. at 469-70.  He testified that he saw plaintiff approximately once or twice a week, including the dart team events.  Tr. at 469, 471.  He testified that he personally observed that she had discomfort in her back.  Tr. at 471.

### The ALJ's Final Decision

The ALJ assessed the credibility of plaintiff's complaints, indicating that her complaints "appeared grossly disproportionate to objective findings

in the medical evidence of the record." Tr. at 23. The ALJ discounted the description of physical and social limitations. Id. He specifically referenced her social interaction with a weekly dart team and the fact that she and her husband eat out regularly. Id.

In the ALJ's final determination, he outlined his conclusions as to plaintiff's residual functional capacity. Based on plaintiff's subjective complaints and the objective medical findings, the ALJ determined that she could return to her past employment as a medical assistant, an assistant manager of a video store, a head housekeeper and a trailer-rental clerk, jobs which require light exertion, or as a secretary, which requires sedentary exertion. Tr. at 24. Thus, the ALJ determined that plaintiff was not under a disability as defined in the Social Security Act. Id.; see 20 C.F.R. § 404.1520(f).

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's decision to deny benefits pursuant to sentence four of 42 U.S.C. § 405(g) is limited. The reviewing court may not decide the facts anew, re-weigh the evidence, or substitute

its judgment for that of the ALJ. Barron v. Sullivan, 924 F.2d 227, 229-30 (11th Cir. 1991); Arnold v. Heckler, 732 F.2d 881, 883 (11th Cir. 1984). Even if the weight of the evidence is contrary to the ALJ's determination, the Court must affirm the administrative decision if there is substantial evidence in the record to support it. Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Barron, 924 F.2d at 230; Martin v. Sullivan, 894 F.2d 1520, 1529 (1 1th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982). Nonetheless, this standard does not relieve the Court of its duty to scrutinize carefully the entire record to determine whether substantial evidence supports each essential administrative finding. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983); Walden, 672 F.2d at 838.

The presumption of validity afforded to the ALJ's findings of fact, however, does not apply to his conclusions of law. Martin, 894 F.2d at 1529; Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982). Failure to apply correct legal standards or to provide the Court with a basis to determine whether correct legal standards were applied constitutes grounds

for reversal.  <u>Martin</u>, 894 F.2d at 1529; <u>Wiggins</u>, 679 F.2d at 1389.

The Commissioner has adopted a five-step analysis for evaluation of disability claims.  20 C.F.R. § 404.1520.  At step one, the Commissioner must inquire whether the plaintiff was employed during the period of the alleged disability.  If the plaintiff held substantial gainful employment during the time of the alleged disability, the Commissioner must deny benefits.  At step two, the Commissioner must determine whether the plaintiff suffers from a severe impairment.  Upon conclusion that the plaintiff's impairment is severe, the Commissioner must determine whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1.  A finding that the impairment meets or equals a listed impairment conclusively establishes disability (step three).  If the impairment, though severe, does not meet or equal a listed impairment, the Commissioner must review the plaintiff's residual functional capacity and the physical and mental demands of past work (step four).  If the plaintiff can still perform past work, the Commissioner will find that the plaintiff is not disabled.  If, on the other hand, the Commissioner finds that the plaintiff cannot perform past work, he must then determine whether the

plaintiff, based on age, education, and past experience, can perform other work (step five).   In this case, the ALJ determined that plaintiff could perform her past work as a medical assistant, an assistant manager of a video store, a head housekeeper, a trailer-rental clerk, and a secretary (as customarily performed), and, therefore, that she was "not disabled" under step four.

## III.   ANALYSIS

Plaintiff raises three issues in her request for review.  She argues that (a) the decision of the ALJ indicates bias; (b) the decision of the ALJ fails to properly consider plaintiff's subjective pain complaints; and (c) the decision of the ALJ fails to consider evidence that plaintiff's psychological impairments had continued or would continue for a twelve month period and were disabling.  Doc. 12.

### A.   Bias of the ALJ

Plaintiff argues that the ALJ condemned plaintiff's lifestyle when he subtly commented on plaintiff's body piercings and tattoos, which then

negatively influenced his credibility assessment.  Doc. 12.  While the ALJ did mention plaintiff's body piercings and tattoos in his decision, his reference to "body art" was relevant to the review of the medical evidence and does not establish bias.

In making his disability decision, the ALJ is obligated to consider all of the medical evidence submitted.  See 20 C.F.R. § 404.1527(b), (d).  The regulations also require the ALJ to discharge his duties without prejudice or partiality.  20 C.F.R. § 404.940; see also Miles v. Chater, 84 F.3d 1397, 1401 (11th Cir. 1996); Otto v. Comm'r of Soc. Sec. 171 Fed. Appx. 782, 785 (11th Cir. 2006).   The Court must begin with the presumption of impartiality, and the plaintiff has the burden of overcoming this presumption by demonstrating evidence of "actual bias or prejudgment." Collier v. Comm'r of Soc. Sec. 108 Fed. Appx. 358, 363-64, (6th Cir. 2004) (citing Schweiker v. McClure, 456 U.S. 188, 196 (1982)).

Plaintiff alleges that although the ALJ did not "overtly condemn the [p]laintiff's lifestyle and personal decision to adorn her body with artwork, he subtly but repeatedly commented on [p]laintiff's tattoos and piercings." Doc. 12.  Plaintiff argues that these repeated comments in his decision

18

suggest a bias on the part of the ALJ, which "influenced his assessment of the [p]laintiff's credibility in the case" and affected the overall fairness of the hearing. Id. Plaintiff concedes that the ALJ never asked plaintiff about her tattoos or piercings during the hearing, and a review of the ALJ's decision demonstrates that he mentioned her body peircings and tattoos in relation to a review of the medical evidence submitted.  The first mention of plaintiff's body piercings is in the context of a gynecological examination by Dr. Collins in which he noted that she had a clitoral ring.  Tr. at 14, 277. The second mention of her body piercings was made in the context of a breast examination in June 2004 to check for masses.  Tr. at. 21.  The ALJ noted that "the breast thickening under scrutiny was determined to have resulted from nipple piercings."  Id. Finally, the ALJ mentioned plaintiff's body tattoos when referring to a physical examination performed by Dr. Hernandez in which he documented that plaintiff had several skin tattoos on her arms, legs, and chest.  Tr. at 19, 409.

Plaintiff has failed to establish that the ALJ harbored any actual bias or prejudice.  In his findings, the ALJ was merely recounting the medical reports and evidence submitted, and nothing in the decision supports

plaintiff's claim that the ALJ made repeated or gratuitous remarks regarding her piercings or tattoos.

Plaintiff also claims that the ALJ made "multiple comments concerning contradictory evidence that [p]laintiff worked as an exotic dancer." Doc. 12. Plaintiff claims that the ALJ used this contradictory evidence to formulate his conclusion that plaintiff's testimony and subjective complaints were incredulous. Id. Dr. Collins' report indicates plaintiff "is an exotic dancer," and "dances for one of the clubs in the area and says that her labia are entirely unacceptable the way they look." Tr. at 277. At the hearing, plaintiff informed the ALJ that Dr. Collins misunderstood her when she told him that she enjoyed dancing. Tr. at 477. Plaintiff stated that dancing was a hobby and that she enjoyed dancing at the local clubs but that she was not an exotic dancer. Id. In his decision, the ALJ accepted plaintiff's explanation that dancing was a leisure activity with regard to the issue of gainful activity but mentioned the inconsistency in plaintiff's testimony at the hearing compared to the medical evidence as support for his finding that plaintiff's subjective complaints were not credible. Tr. at 23.

Credibility determinations are the province of the ALJ, and when those assessments are supported by specific legitimate considerations they will be affirmed. See Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984) (per curiam). Inconsistencies between plaintiff's testimony and the medical records certainly falls into the category of factors traditionally relevant to a credibility assessment. Furthermore, the ALJ did not rest his decision to discount plaintiff's subjective complaints merely on this contradictory evidence. In rejecting the severity of plaintiff's subjective complaints, the ALJ relied on various inconsistencies, including the frequency or type of treatment provided as compared with the degree of limitation alleged, as well as plaintiff's report of daily activities as compared with reported symptoms and alleged limitations. Tr. at 23. It is not accurate to say that some prejudice against the exotic dancing influenced the ALJ's decision. What influenced the credibility assessment of plaintiff's subjective complaints was the overall vacillating allegations that conflicted with the objective findings in the medical record.

Plaintiff has failed to demonstrate actual bias, and the Court does not discern any basis on which to conclude that the ALJ was biased in a manner

which affected the overall fairness of the hearing.

## B.    Consideration of Plaintiff's Pain Complaints

Plaintiff argues that the ALJ erred by failing to consider properly

plaintiff's subjective pain complaints, which according to plaintiff are well

supported by objective medical evidence. Doc. 12. The Eleventh Circuit has

determined that:

> a three part 'pain' standard applies when a claimant attempts
> to establish through his or her own testimony of pain or other
> subjective symptoms.  The pain standard requires (1) evidence
> of an underlying medical condition and either (2) objective
> medical evidence to confirm the severity of the alleged pain
> arising  from  that  condition  or  (3)  that  the  objectively
> determined medical condition must be of a severity which can
> reasonably be expected to give rise to the alleged pain.  The
> standard also applies to complaints of subjective conditions
> other than pain.

Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted);

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  If plaintiff has

a medically determinable ailment that can reasonably be expected to

produce the symptoms alleged, the Commissioner must evaluate the

intensity and persistence of the symptoms to determine to what extent the

symptoms limit the plaintiff's capacity to work.  20 C.F.R. §§ 404.1529(c),
416.929(c). In reaching a conclusion regarding a claimant's disability, the
ALJ considers "all of the evidence presented, including information about
[plaintiff's] prior work record, [plaintiff's] statements about [plaintiff's]
symptoms, evidence submitted by [plaintiff's] treating or nontreating
source, and observations by [Social Security Administration] employees and
other persons." 20 C.F.R. § 404.1529(c)(3).

It is reversible error, however, if complaints of subjective pain are
disregarded simply because they are not supported by objective clinical and
laboratory findings.  Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986).
The ALJ "must necessarily review the medical evidence and make a
credibility determination in assessing the claimant's disability on the basis
of pain." Id. at 624.  If the ALJ decides not to credit a claimant's subjective
testimony, he must discredit it explicitly and articulate his reasons for doing
so. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991).

Here, the ALJ determined that plaintiff's subjective complaints were
not credible for the following reasons:

> The medical evidence indicates that the [plaintiff] has severe chronic
> low back pain syndrome secondary to her history of abdominal

23

surgeries, an impairment that is 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. The [plaintiff] demonstrated good muscle strength and good range of motion throughout and was essentially neurologically intact in repeated physical examinations.
. . .
The evidence of record, discussed in detail above, is filled with plaintiff's vacillating allegations that differ significantly with her subjective complaints and objective medical/psychological findings documented by treating and examining sources.

Tr. at 22-23.

The ALJ therefore found that the medical evidence supported a finding of an underlying medical condition, satisfying the first prong of the pain standard. Tr. at 22. But the ALJ further concluded that plaintiff did not meet the second or third prong of the pain standard.  The ALJ noted that "[t]he severity or duration of reported limitations were not consistent with medical findings (clinical signs and/or laboratory findings)." Tr. at 23. The ALJ reviewed plaintiff's subjective complaints of physical pain in light of the objective medical evidence garnered from treating and consulting doctors and concluded that the degree of plaintiff's asserted pain did not correspond to the evidence of physical injury.

Plaintiff testified at the hearing that her low back and leg pain and

the deterioration of her bones and nerves in her back and hips was one of the worst problems that kept her from securing employment.  Tr. at 456. She also complained of abdominal pain and urinary incontinence.  Tr. at 457.

The ALJ noted that plaintiff's medical records, which date back to September 4, 1992, reflect no examination of her back or lower extremities for pain complaints until April 12, 2004, during a visit to Dr. Allcock.  Tr. at 17.  Furthermore, Dr. Allcock's findings do not comport with plaintiff's subjective pain complaints.  According to Dr. Allcock, plaintiff's treating physician, plaintiff had normal range of motion in the thoracic, cervical, and lumbar spine. Tr. at 389.  An MRI study was normal and reflected no canal stenosis.  Tr. at. 391.  In a follow-up visit on June 22, 2004, plaintiff reported that pain in her low back and leg had reduced, and that the reason she was not working was due to the urinary and bowel incontinence. Tr. at 384.

Physical therapy records from Dr. Colleen Johnson demonstrate that on July 9, 2004, plaintiff complained of severe low back and leg pain that had been ongoing for approximately one year, despite reporting to Dr.

Allcock seventeen days earlier that her pain had reduced. Tr. at 433. After five visits to Dr. Johnson, plaintiff reported much better strength and stability of her low back and better overall endurance for daily activities as well as increased bladder control.   Tr. at 429.   Dr. Johnson also recommended an independent home exercise program and walking program to build endurance. Tr. at 429. Plaintiff testified at the hearing, however, that she does not exercise. Tr. at 455.

During disability evaluations with Dr. Novack and Dr. Hernandez, plaintiff's chief complaints were low back and leg pain; however, she made no complaint of urinary or bowel incontinence. Tr. at 399, 408. Dr. Novack did not appreciate any muscle atrophy or muscle spasms. Tr. at 400. He did not consider plaintiff disabled from a musculoskeletal or peripheral neurological standpoint. Tr. at 401. Dr. Novack estimated that plaintiff could lift 20 pounds occasionally and 10 pounds frequently. Tr. at 405. Dr. Hernandez found no evidence of muscular weakness or sensory deficits. Tr. at 410.   He also concluded that plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently, and could push and pull with both upper and lower extremities to an unlimited degree. Tr. at 411-12. Dr.

Hernandez advocated that returning to work would help plaintiff forget her pain problems.  Tr. at 410.

The Court finds that the ALJ properly considered plaintiff's subjective complaints of pain in light of the objective medical evidence, as required under <u>Holt</u>.  The Court further finds that the ALJ properly made a credibility determination regarding the subjective complaints of pain and adequately articulated his rationale for discrediting plaintiff's testimony. Accordingly, the ALJ's determination was based on substantial evidence and was a correct application of the law.

## C.   Consideration of Plaintiff's Psychological Impairments

Plaintiff claims that the ALJ disregarded findings by Dr. Nagelberg and the state agency psychologist and failed to consider the psychiatric diagnoses from the doctors at the Savannah Area Behavioral Health Collaborative ("SABHC") which supported plaintiff's contention that her psychological impairments had or would continue for a twelve-month period.  Doc. 12.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially

27

'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted). If an ALJ rejects a treating physician's opinion, he "may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." Id. (quoting Plummer, 186 F.3d 429). It is equally clear, however, that "[t]he treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); accord Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987). Further, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

In this case, the ALJ properly concluded that plaintiff failed to establish that she had a mental impairment for at least twelve consecutive

months as required under 20 C.F.R. 404.1527(a)(1). Tr. 21. The record reflects plaintiff's sporadic mental health treatment. Plaintiff's first documented psychological visit since the onset of her alleged disability was on May 22, 2002 with Dr. Frank M. Johnston. Tr. at 225-26. During the initial visit, plaintiff complained of depression, crying spells, anger, anorexia, and no libido. Id. The record reflects however that as Dr. Johnston's treatment progressed, plaintiff's mental status improved and she denied symptoms of depression on October 23, 2002, February 5, 2003, and March 19, 2003. Tr. at 217, 218, and 221. Plaintiff's treatment from Dr. Burnsed-Geffen from August 2002 until January 2003 also reflects wavering complaints of depression. See Tr. at 198-205. A psychiatric review completed by Dr. Jeffrey Vidic on June 3, 2003, indicated that plaintiff's psychological complaints were not supported by medical evidence, and thus, were only partially credible. Tr. at 253.

Dr. Nagelberg's state agency evaluation on July 17, 2003 indicates that plaintiff's mood appeared depressed and that she might have difficulty in a work-related environment. Tr. 288-291. While the ALJ referenced Dr. Nagelberg's evaluation, he noted that it had no evidentiary value as it was

based on plaintiff's "unsupported, inconsistent, and incredulous reports." Tr. at 23. There is no evidence that the ALJ discounted this evaluation due to his own credibility judgments, speculation, or lay opinion; rather he did so on the basis of contradictory medical evidence and the lack of objective medical support for Dr. Nagleberg's evaluation.

Plaintiff also alleges that the ALJ ignored plaintiff's medical records from SABHC. The record, however, reflects that the ALJ did in fact consider medical evidence from SABHC. In his decision, the ALJ noted that during treatment at SABHC, plaintiff "resumed claims of anger, depression, and trauma stemming from 2002 surgery . . . that left her traumatized and unable to return to work." Tr. at 20. A further review of the records from SABCH indicates that on July 27, 2004, plaintiff's last reported visit, she represented no thoughts of suicide, was goal directed, and was able to stay calm and process her anger. Tr. at 353.

The objective medical evidence supports the conclusion that plaintiff's symptoms of depression responded to treatment and improved to the extent that her ability to perform work-related activities was not impaired for any consecutive twelve-month period since the date of the alleged onset of

disability.  The ALJ therefore adequately reviewed and considered all the medical evidence submitted, including that of Dr. Nagelberg and SABHC, and plaintiff's allegations of errors on this ground are without merit.

## III.  CONCLUSION

Based on the foregoing, the decision of the Commissioner should be AFFIRMED.

**SO REPORTED AND RECOMMENDED** this _3/st_ day of **January 2007.**

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA